# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 25-651

**STATE OF LOUISIANA**

**VERSUS**

**BILLY W. HYATT**

**********

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. CR-2023-971
HONORABLE MARTHA A. O'NEAL, DISTRICT JUDGE

**********

**GARY J. ORTEGO**
**JUDGE**

**********

Court composed of Sharon Darville Wilson, Gary J. Ortego, and Clayton Davis, Judges.

**AFFIRMED.**

Hon. James R. Lestage
District Attorney
36th Judicial District
Adam M. Bone
Assistant District Attorney
Richard A. Morton
First Assistant District Attorney
124 South Stewart St.
DeRidder, LA 70634
(337) 463-5578
COUNSEL FOR APPELLEE:
    State of Louisiana

Remy Voisin Starns
State Public Defender
Louisiana Appeals & Writ Service of
The Office of the State Public Defender
301 Main St., Suite 700
Baton Rouge, LA 70325
(225) 219-9305
COUNSEL FOR DEFENDANT/APPELLANT:
    Billy W. Hyatt

Annette Fuller Roach
P. O. Box 6547
Lake Charles, LA 70606
(337) 436-2900
COUNSEL FOR DEFENDANT/APPELLANT:
    Billy W. Hyatt

**ORTEGO, Judge.**

On May 8, 2025, the State filed an amended bill of information charging Defendant, Billy W. Hyatt, with the following: 1) possession of less than twenty-eight grams of a Schedule II controlled dangerous substance–methamphetamine–with intent to distribute, in violation of La.R.S. 40:967(A)(B)(1)(a); 2) illegal carrying of weapons, in violation of La.R.S. 14:95(E); and 3) possession of a firearm by a person convicted of a felony, in violation of La.R.S. 14:95.1. On May 19, 2025, jury selection occurred, and evidence was adduced from May 20 through May 21, 2025. On May 22, 2025, the jury unanimously found Defendant guilty on all counts.

On June 2, 2025, the State filed a habitual offender bill of information. On June 9, 2025, Defendant filed a motion for new trial, which was denied that same day. Also on June 9, Defendant stipulated that he was a fourth felony offender. Because of this, the State agreed to recommend twenty-year hard labor sentences for counts one and two. While count one was to be served without benefit of probation or suspension of sentence, count two was to be served without benefit of probation, parole, or suspension of sentence. Additionally, the State agreed to recommend that these two sentences run concurrently. There was no sentencing recommendation regarding count three.

On June 16, 2025, Defendant was sentenced. For count one, he received twenty years at hard labor without benefit of probation or suspension of sentence. For count two, he received twenty years at hard labor without benefit of probation, parole, or suspension of sentence. For count three, he received forty years at hard labor without benefit of probation, parole, or suspension of sentence. The court ordered counts one and two to run concurrently to each other. However, they were to run consecutively to count three, as well as to any other sentence that was imposed on Defendant in the past.

After receiving these sentences, Defendant told the court he intended to file a motion for appeal. However, since Defendant had already filed one on June 6, 2025, the court told Defendant there was no need to file a new motion. The trial court, on June 16, 2025, using the June 6 filing, granted Defendant's appeal, and Defendant lodged his appeal with this court on February 11, 2026.

## ASSIGNMENTS OF ERROR:

Defendant's appeal contains three assignments of error.

1) The evidence was insufficient to support the convictions for each of the three offenses - illegal possession of a weapon while in possession of a controlled dangerous substance, possession of a firearm by a convicted felon, and possession with intent to distribute less than twenty-eight grams of Methamphetamine, a Schedule II controlled dangerous substance - as the evidence presented at trial failed to establish beyond a reasonable doubt that Billy W. Hyatt had either physical or constructive possession of either the firearm or the methamphetamine.

2) The evidence admitted at trial was insufficient to prove beyond a reasonable doubt that Billy Hyatt illegally possessed a weapon while in possession of a controlled dangerous substance as the State failed to establish the required nexus between the firearm and methamphetamine which were found in different areas of the camper trailer.

3) Counsel violated Appellant's Sixth Amendment right to the effective assistance of counsel when counsel failed to either request the required "nexus" charge be given to the jury or object to the court's failure to instruct the jury regarding the "nexus" requirement for a violation of La. R.S.14:95(E) when a State asserts constructive possession of the drugs and firearm. Counsel further violated Appellant's Sixth Amendment right to the effective assistance of counsel when he failed to object to the State's improper reference during closing arguments to Billy Hyatt's failure to offer an alibi defense at the time of his arrest. As a result of counsel's failure to object, the functioning of the adversarial process was undermined, rendering the verdicts suspect and resulting in Appellant being denied a fair trial.

## FACTS:

Since Defendant asserts a claim of insufficient evidence, the facts will be provided in the section pertaining to that claim.

2

## ERRORS PATENT:

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO:

Defendant contends that there was insufficient evidence to support his three convictions. Particularly, Defendant says the evidence was insufficient because the State failed to prove that he had constructive possession of the drugs and firearm that were found in his purported residence. Additionally, Defendant argues that the state failed to establish a nexus between the firearm and methamphetamine. Thus, the state failed to prove he illegally possessed a weapon while in possession of a controlled dangerous substance.

*Relevant Law*

The analysis for insufficient evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Regarding appellate review in cases relying on circumstantial evidence, this court has stated the following:

When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10–11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826–27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, 583 U.S. 950, 138 S.Ct. 392 (2017). The testimony of a single witness, if believed, and absent internal contradictions or irreconcilable conflicts with physical evidence, is sufficient to support a conviction. *State v. Pierre*, 14-1071 (La.App. 3 Cir. 5/6/15), 170 So.3d 348, *writ denied*, 15-1151 (La. 5/13/16), 191 So.3d 1054.

Here, Defendant was convicted of possession with intent to distribute less than twenty-eight grams of methamphetamine, illegal carrying of weapons, and possession of a firearm by a person convicted of certain felonies.

Regarding the first conviction, La.R.S. 40:967 states that it shall be unlawful for any person to knowingly or intentionally produce, manufacture, distribute, or dispense or possess with intent to produce, manufacture, distribute, or dispense a controlled dangerous substance or controlled substance analogue classified in Schedule II. As for the second conviction, La.R.S. 14:95(E) states that an offender commits the crime of illegal carrying of weapons when he uses, possesses, or has under his immediate control any firearm while unlawfully in the possession of a controlled dangerous substance. As to the third conviction, La.R.S. 14:95.1 states that it is unlawful for any person who has been convicted of any violation of the

4

Uniform Controlled Dangerous Substances Law which is a felony to possess a firearm.[1]

Concerning the constructive possession of illegal substances, in *State v. Magdaleno*, 03-618, pp. 4–5 (La.App. 3 Cir. 10/1/03), 856 So.2d 1246, 1249–50, *writ denied*, 03-3342 (La. 3/26/04), 871 So.2d 347, this court said the following:

> Regarding the charge of possession, the State is not required to prove that the defendant was in actual possession of the cocaine; instead, the defendant may be found to have been in constructive possession. *State v. Scott,* 00-113 (La.App. 3 Cir. 6/7/00), 768 So.2d 112, *citing State v. Montgomery,* 98-775 (La.App. 3 Cir. 1/27/99), 734 So.2d 650. If the State's case is premised upon constructive possession, the State must prove that the controlled dangerous substance was within the defendant's dominion and control or in his joint possession. *Scott,* 768 So.2d 112, *citing State v. Trahan,* 425 So.2d 1222 (La.1983), and *State v. President,* 97-1593 (La.App. 3 Cir. 7/15/98), 715 So.2d 745, *writ denied,* 98-2115 (La.12/11/98), 729 So.2d 590. Joint possession is described in *State v. Segura,* 546 So.2d 1347 (La.App. 3 Cir.1989), as two people willingly and knowingly sharing a direct right in the thing and an ability to exercise control over it. Constructive possession is established by reference to the factors set forth in *State v. Toups,* 01-1875 (La.10/15/02), 833 So.2d 910, in an examination of the facts at hand: for example, the defendant's knowledge that illegal drugs are in the area; the defendant's relationship with the person who has physical possession of the drugs; the defendant's access to the area where the drugs were found; evidence of recent drug use by the defendant; and the defendant's physical proximity to the drugs. A sixth factor given parenthetical reference in *Toups* is "evidence that the area was frequented by drug users." *Toups,* 833 So.2d at 913, *citing Bujol v. Cain,* 713 F.2d 112 (5th Cir.1983), *cert. denied,* 464 U.S. 1049, 104 S.Ct. 726, 79 L.Ed.2d 187 (1984). In addition, the State must prove the defendant's guilty knowledge. *Toups,* 833 So.2d at 913. However, the mere presence of someone in the area where the controlled dangerous substance is located or mere association with the person found to be in possession of the controlled dangerous substance does not constitute constructive possession. *Id.*; *see also State v. Walker,* 369 So.2d 1345 (La.1979), *State v. Cann,* 319 So.2d 396 (La.1975).

As for possession regarding illegal carrying of weapons, the Louisiana Supreme Court held that the term "possess" in La.R.S. 14:95(E) is broad enough to

---

[1]In 2004, Defendant pled guilty to criminal conspiracy to commit possession of four hundred grams of methamphetamine, in violation of La.R.S. 14:26 and La.R.S. 40:967(F)(2)(c).

encompass both actual and constructive possession. *State v. Blanchard*, 99-3439, (La. 1/18/01), 776 So.2d 1165. Whether there is sufficient "possession" to convict is dependent on the facts of each case. *State v. Harris,* 1994-970 (La. 12/8/94), 647 So.2d 337; *State v. Bell,* 566 So.2d 959, 960 (La.1990); *State v. Johnson*, 03-1228, (La. 4/14/04), 870 So.2d 995. The State must show it was within the defendant's dominion and control to prove constructive possession of a firearm. Having dominion and control over a weapon constitutes constructive possession even if it is only temporary and even if the control is shared. *Id.*

However, constructive possession also entails an element of awareness or knowledge. A defendant must know that the firearm is there and must have general intent to possess it. This knowledge and intent may be inferred from the circumstances and proved by direct or circumstantial evidence. *Id.* Also, the State must prove there is a nexus between the firearm and controlled dangerous substances, meaning that there is a connection between the possession of the firearm and the drug offense. *Blanchard*, 776 So.2d 1165. This connection might be established by (1) the type of firearm involved; (2) the type of controlled dangerous substance involved; (3) the quantity of drugs involved; (4) the proximity of the firearm to the drugs; (5) whether the firearm is loaded; and (6) any other relevant evidence. *Id.* Ultimately, the nexus requirement is fact sensitive. *State v. Jordan*, 06-187 (La.App. 5 Cir. 9/26/06), 938 So.2d 805.

*Evidence and Testimony*

Detective Robert Hunt was the supervisor of the Beauregard Narcotics Task Force. He testified that on January 9, 2023, he investigated a property located at 128 Kansas Street in Singer, La. When Detective Hunt arrived at the property, there was a man in a "shop area" that was attached to a trailer camper which was purported to be Defendant's residence. The man identified himself as Kevin Rogers, and said he

lived elsewhere at 109 Fifth Street. Mr. Rogers also told Detective Hunt that Defendant was at work. Mr. Rogers was at Defendant's residence to work and feed the dogs. Detective Hunt then performed a pat-down search of Mr. Rogers and found a plastic container with one to two grams of meth and a glass smoking device. Detective Hunt asked Mr. Rogers where he got the meth, and Mr. Rogers said he got the meth from "here." After this, Detective Hunt obtained a search warrant for Defendant's property, which he executed on January 9, 2023.

Detective Hunt described Defendant's residence as small and well kept. To Detective Hunt, the residence from end to end was about fifty to sixty feet long. The "shop" or "garage" area where Detective Hunt met Mr. Rogers was attached to the residence. However, though attached, it was impossible to access the interior of the residence from the shop area. The home's front door opened into its only bedroom, which had a bathroom to the side of it. A single hallway connected the bedroom to the kitchen and living room, and there was an addition to the house which Detective Hunt described as a sitting area. In this room, a home surveillance system monitor was on, and the AC unit also appeared to be on. Around the residence, clothes and shoes matching Defendant's size were found. There was a photograph of Defendant hanging on the wall. Some mail had Defendant's name but not the same address as his residence. Also, there was a valid Visa debit card with Defendant's name and an expiration date of 2024. Detective Hunt found a loaded 9mm handgun and a box of live ammunition in the nightstand next to the bed. On the counter in the sitting area, he saw a meth pipe, a "meth glass," and a smoking device, as well as a large torch lighter and bags with residue of methamphetamine. Underneath the laundry hamper in the hallway, Detective Hunt found a wooden box with Defendant's last name on it. Inside the box, there were two digital weighing scales, a black "hide a key" box containing residue of methamphetamine, a zip-lock bag containing

methamphetamine wrapped in a coffee filter, and a large bag of methamphetamine weighing approximately 22.6 grams.

Thereafter, Detective Hunt called Defendant to tell him he was going to be arrested. Detective Hunt suggested Defendant turn himself in, but Defendant refused.  An electronic warrant was sought, and Defendant was located via the ping information from his cellphone. On January 22, 2023, the police went to 1207 Ravia Road in Sulphur, La.  As they arrived, a woman driving a red truck tried to leave, while Defendant fled towards a wooded area. The woman was arrested sometime later and was identified as Bridget Cooley.  Defendant's attempt to evade arrest failed, and he was detained and searched. Detective Hunt testified that when Defendant was arrested, he had on his person a zipped style bag that contained meth, a torch, a cigarette lighter, and a glass smoking device. Defendant's vehicle was also searched, and the police found his valid current driver's license, with his address listed as 128 Kansas Street, Singer, La.

On cross-examination, Detective Hunt noted some of the mail found at Defendant's residence was from October of 2019. When asked whether he thought Mr. Rogers was in control of the residence, Detective Hunt responded no. Detective Hunt opined that Defendant owned the house, and it was therefore under his control regardless that Mr. Rogers was arrested in the garage of the house and that the front door was unlocked. On redirect, Detective Hunt also testified that Defendant's residence at 128 Kansas Street showed signs of Defendant living there, and he noted that Mr. Rogers had his own home with a different address. Ultimately, to Detective Hunt, the Defendant lived at 128 Kansas Street.

Detective Jeremy Cain worked for the Sulphur Police Department and took part in Defendant's arrest on January 22, 2023. He testified that before the arrest, Defendant refused to turn himself in. After arresting Defendant, a small zip-lock bag

8

with methamphetamine residue and little crystals was taken directly off Defendant's person. Detective Cain was aware that because of this January 22 arrest, Defendant pled guilty to possession of a controlled dangerous substance, schedule II, and the date of conviction or sentence was September 14, 2023. Detective Cain testified that Defendant's address was stated as 128 Kansas Street, Singer, La.

Michael Shane Fruge was a former officer who was involved in the January 9, 2023 investigation which led to Defendant's arrest. Officer Fruge investigated Defendant for narcotics charges in 2002. He testified that during both investigations Defendant's residence was at 128 Kansas Street, Singer, La. Therefore, he knew the house at 128 Kansas Street had belonged to Defendant since 2002.

Cristina Cypher, a United States Probation Officer Specialist, testified that Defendant pled guilty in 2016 to a federal offense, namely to conspiracy to possess methamphetamine with intent to distribute. After Defendant served his sentence, he was released under conditions of supervision, and Officer Cypher began supervising Defendant on April 30, 2021. At that time, Defendant was living at 128 Kansas Street, Singer, LA. On September 22, 2022, Defendant informed Officer Cypher that he was opening his own mechanic shop. This was the "shop area" that was attached to his house. However, Officer Cypher testified that there was no documentation that Defendant opened a business. On October 6, 2022, Defendant did not report to Officer Cypher's office, but she saw him for the last time on October 14, 2022. Officer Cypher testified that from October 14, 2022, to January 10, 2023, she attempted to conduct home visits, and she went to Defendant's residence on November 27, 2022, December 16, 2022, and January 10, 2023. Each time, Defendant was not there. Regarding the November 27 visit, Officer Cypher testified that Defendant's house "did not look any different than the other times that [she] had visited that residence." As for the other visits, she said, "Everything appeared to be

9

the same as all previous home contacts." Officer Cypher testified that she did not receive any information about Defendant changing his address. Moreover, she was never informed of any change of employment. Prior to October 2022, Officer Cypher noted, Defendant was working as a handyman in Sulphur, La.

Charles Williams was the State's last witness. He was a probation and parole officer and supervisor, and he was familiar with the database that his office used to keep track of parolees. Officer Williams testified that their database listed Defendant's address as 128 Kansas Street, Singer, La. Then, on October 4, 2023, it indicated that Defendant signed a form to change his address, apparently because he was soon to be released on parole. Defendant, however, again indicated his address was 128 Kansas Street, Singer, La., so his address did not in fact change. Officer Williams noted Defendant signed the change of address form after the January 9, 2023 offense date.

The first witness for the defense, Angela White, testified she previously worked as a property manager for Custom Touch Village in Sulphur, La. Her boyfriend at the time was Stevie Vanwinkle, a contractor. Ms. White testified that often Custom Touch Village hired contactors to do repairs on units, and in October of 2022, Mr. Vanwinkle hired Defendant as a handyman to redo floors. Ms. White testified that Defendant asked for permission to stay on site since his vehicle was not registered. For its workers, Custom Touch Village had solution housing or "man camps." This particular "man camp" was a trailer park located at 1207 Ravia Road, Sulphur, La., where Defendant was arrested. Ms. White and Mr. Vanwinkle lived in the trailer park in a three-bedroom unit. Ms. White testified that Defendant began to stay with them in November of 2022, and the arrangement was meant to be temporary as Defendant was to move out once he finished his job. However, the job did not end until March 24, 2023, and then Defendant was arrested. Ms. White

testified that from November 2022 to the time of his arrest, Defendant stayed in the unit.

On cross-examination, Ms. White explained that Defendant was permitted to stay with her and Mr. Vanwinkle because Mr. Vanwinkle and Defendant were friends. Additionally, she noted Defendant's truck worked, and he was able to move around. Thus, she did not know Defendant's location at every moment. Ms. White testified she was not aware that Defendant's parole officer, Ms. Cypher, did not know Defendant was employed by Ms. White. She further explained Custom Touch Village kept no records on workers because they were contractors. Furthermore, because Mr. Vanwinkle paid Defendant from his own earnings, there was no record showing Defendant had been paid by the business. Consequently, there was no record showing Defendant ever worked for Custom Touch Villages.

Additionally, during cross and redirect, Ms. White testified about an email between her and Defendant, as well as a phone call which occurred on May 19, 2025, while Defendant was incarcerated. Ms. White again testified about this email and phone call with Defendant during the State's presentation of her as a rebuttal witness. The State presented this to suggest that the email and phone call showed that Defendant considered Ms. White his "star witness" and coached her on how to testify. Nevertheless, Ms. White ultimately insisted that she would not lie on Defendant's behalf and that she told the truth.

Defendant's mother, Dolores Navarro, also testified. She testified she lived at 128 Kansas Street, Singer, La. in a mobile home that was on the property. Ms. Navarro further testified that behind her mobile home, there was a little camper trailer where Defendant resided. The mobile home and the camper trailer shared the same address and the same utility bill, and she was responsible for the utility bill and had been paying it for ten years. She testified that no one, but her and Defendant

11

lived on the property. When asked when Defendant last lived on the property, Ms. Navarro eventually determined it was around eight months before Defendant's trial. Ms. Navarro also testified that for some time in 2022, Defendant was living and working in Sulphur.

Regarding the January 9, 2023 police investigation, Ms. Navarro explained why Kevin Rogers was found on the property. Mr. Rogers was her child's cousin. Often, Mr. Rogers visited to take care of the dogs and clean the yard. Ms. Navarro noted that her daughter lived around the corner and said, "[T]hey're all cousins, so they all come around there. [Mr. Rogers] would go to my ex-husband's home. You know, he would come and visit, he would visit with me a lot of times." After this, Ms. Navarro was asked whether Mr. Rogers would go to Defendant's camper. She answered, "Alone? No." On redirect, Ms. Navarro testified she would consider it odd if she saw Mr. Rogers enter Defendant's camper. If Mr. Rogers did so, she would consider that "breaking in," but not if he went only into the garage. She also noted that she was at work when the police and Mr. Rogers were on her property. Consequently, Ms. Navarro did not have the opportunity to know what Mr. Rogers was doing until she returned home from work.

Next, Ms. Navarro testified about a man named Christopher Rainwater who lived in the area:

Q. [H]ow do you know Mr. Rainwater?

A. He's friends with all of my kids and all of my family.

Q. Does Mr. Rainwater ever visit the property at 128 Kansas Street?

A. Yes, sir.

. . . .

Q. When was the last time you witnessed him there?

A. The day the officers left.

. . . .

A. Came right through the yard on a four-wheeler.

Q. Did you attempt to communicate with Mr. Rainwater at all?

A. No, sir.

Q. Did Mr. Rainwater attempt to communicate with you?

A. No, sir.

Additionally, Ms. Navarro said Mr. Rainwater rode through the backyard, which was a "pretty good size yard," and was "hauling butt" towards the front yard.

Defendant's sister, Luanna Decker, lived on 108 Sixth Street, which was about a block behind Defendant's residence at 128 Kansas Street. Ms. Decker testified that on January 9, 2023, she was sleeping and unable to see anybody in Defendant's backyard. Ms. Decker woke up when the police knocked on her door and asked her about Mr. Rainwater. According to Ms. Decker, the police were looking for Mr. Rainwater because he had stolen a truck. Ms. Decker testified that she never witnessed Mr. Rainwater at the address of 128 Kansas Street, nor did she ever see anyone enter Defendant's camper trailer. Though she knew Defendant was working on some apartments in Sulphur, Ms. Decker did not know whether Defendant was staying in Sulphur or at the camper trailer.

*Defendant's Brief*

Defendant argues that no evidence established he was occupying the camper trailer or that he knew of the methamphetamine found there. While he acknowledges 128 Kansas Street was his address for years, he argues ownership of property does not equate to knowledge of everything located on the property. As to the wooden box, Defendant testisfied that indeed the wooden box was adorned with his last name, but that does not mean he placed the items inside the box and had knowledge of its contents. Defendant further contends that while Mr. Rogers stated he had

gotten the methamphetamine from "here," he never stated he had obtained it from Defendant, and no one testified to seeing Defendant in actual possession of methamphetamine. Defendant argues that the testimony of Mr. Rogers, Ms. Navarro, and Ms. White established that he was away from home and living at his workplace. Defendant further argues that this was supported by the home visits his federal probation officer had attempted in November, December, and January. Also, Defendant notes that his front door was unlocked. It was apparent, he argues, that someone had been in the camper shortly before the officers arrived. Defendant suggests someone other than him had been at the residence, as he states that Christopher Rainwater was seen in the area of the camper after law enforcement left. For these reasons, Defendant argues there was a reasonable hypothesis of his innocence.

Moreover, and as to his second assignment of error, Defendant contends the evidence was also insufficient to support his conviction of illegally possessing a weapon while in possession of a controlled dangerous substance. Defendant argues the firearm was found inside the nightstand in the bedroom of the camper, while the methamphetamine was discovered in a box under a laundry hamper in the hallway. Since the methamphetamine and firearm were not in close proximity and were in separate areas of the camper, Defendant suggests there was insufficient evidence to prove either constructive possession or the required nexus between the firearm and the methamphetamine.

*Analysis*

In brief, Defendant notes this court's opinion in *State v. Johnson*, 24-462 (La.App. 3 Cir. 5/8/25), 416 So.3d 627, where this court concluded that the defendant's presence in the room where the contraband was located was insufficient to establish constructive possession. The defendant in *Johnson* was in a hotel room

14

with a woman who had rented the room, and she claimed ownership of the contraband. We find *Johnson* provides very little assistance in deciding the present case, as the facts are unrelated and not similar to those in this matter.

This court's opinion in *State v. Pittman*, 11-952 (La.App. 3 Cir. 3/7/12), 85 So.3d 821, *writ denied*, 12-0656 (La. 4/11/12), 85 So.3d 1233, is apposite. In *Pittman*, the police were notified that a narcotics dog alerted on a UPS package being shipped to the defendant's residence. The police executed a search warrant of the residence thirty minutes after a controlled delivery of the UPS package. During the search, the police found marijuana in the bedrooms of the defendant's residence. However, while there were three people in the residence at the time of the search, the defendant was not present. During trial, documentation was admitted into evidence showing that the defendant started to work at Dynamic Industries at the time the search warrant was executed. Notably, time tickets showed that during the relevant dates the defendant was away working on an offshore rig. This court found the State failed to prove the element of possession and vacated the defendant's conviction of possession of marijuana with intent to distribute. In doing so, it reasoned:

*Knowledge*

In its closing argument, the State maintained the marijuana found in Pittman's house was there before the UPS package was delivered to his house. Yet, the State presented no evidence regarding when the marijuana found in the bedrooms of the residence was placed there.

The only evidence the State offered to prove Pittman knew the marijuana was in the bedrooms was Officer Judice's testimony regarding Pittman's statement during his arrest that there were no drugs at the residence. Pittman's statement can be interpreted in several ways, including, but not limited to: (1) the marijuana was located in the bedrooms of the residence prior to Pittman's reporting to work offshore, and he was aware of its presence; (2) he knew someone was delivering or bringing marijuana to his residence either at his direction or that of someone else's, and it was brought to the residence and placed in the bedrooms while he was working offshore; or, (3) he had no knowledge

15

the marijuana was in the bedrooms of his residence until after it had been seized by police, and the occupants of the residence were arrested. Thus, the State's proof of this factor is unconvincing.

*Relationship with Person in Possession*

No one at the residence, when the search warrant was executed, was in actual possession of the marijuana. Additionally, the State did not put on testimony or evidence proving Pittman had a relationship with Fuselier, Butler, or Walker, whether or not these individuals lived at the residence, and if they did not, how long they had been at the residence on August 23, 2007.

*Access to Area & Proximity*

Pittman had access to the area where drugs were found when he was at the residence. Nevertheless, it was stipulated that Pittman was working offshore August 22 through 24, 2007, and there was no evidence presented regarding when the marijuana was placed in the bedrooms of the residence or by whom.

*Recent Use*

There was no testimony regarding Pittman's recent drug use.

Based on these considerations, the State failed to prove beyond a reasonable doubt that Pittman had constructive possession of the marijuana found in the bedrooms of his residence.

*Id.* at 829–30 (footnotes omitted).

In *State v. Robinson*, 11-12 (La.App. 5 Cir. 12/29/11), 87 So.3d 881, *writ denied*, 12-0279 (La. 6/15/12), 90 So.3d 1059, constructive possession was established. In *Robinson*, weapons and a large quantity of drugs were found in a residence located at 3232 Kentucky Avenue in Kenner, La. While the investigators assumed this was the defendant's address, the defendant, throughout the investigation and again at trial, maintained that he lived with his wife and mother at 1110 Demarco Street in Marrero, La. On review, however, the fifth circuit held that there was sufficient evidence establishing 3232 Kentucky Avenue as the defendant's residence, as well as the defendant's constructive possession of the drugs and weapons. The fifth circuit stated:

[A]t trial, Lieutenant Jewell testified that pursuant to the defendant's arrest, the defendant and his vehicle were searched, at which time $2,205.00 in cash and a cell phone were recovered from defendant's person, and a rental agreement (in the name of his wife, Sharon Robinson), a second cell phone, a set of keys, and a tally sheet were recovered from inside the vehicle. Moreover, when the defendant was asked where he lived, he responded that he lived at 1110 Demarco Street with his mother and wife, Sharon Robinson. However, upon questioning his mother at her home on Demarco Street, she denied that defendant lived with her and told officers that he in fact lived with his wife in "Metairie somewhere." Based on this information, Lieutenant Jewell obtained a search warrant for defendant's home at 3232 Kentucky Avenue where he was known to reside with his wife. Lieutenant Jewell further testified that one of the keys on the key ring seized from defendant opened the front door of the home on Kentucky Avenue. Additionally, upon searching his home on Kentucky Avenue, Lieutenant Jewell testified that two pistols were retrieved from the top of an armoire located in the master bedroom along with $10,000.00 in cash, and a tally sheet matching the one found in the vehicle, in addition to a picture of the defendant in the living room, and paperwork, including a Cox Cable bill, Medicaid, and Social Security Administration documentation, bearing the defendant's name and the Kentucky Avenue address. Lieutenant Jewell also testified that in the master bedroom where the guns were retrieved, a large amount of men's clothing, shoes, and hats were also found. The officers also recovered contraband in the common areas of the house, including, 255 grams of cocaine split between nine clear plastic bags found in the washing machine in the garage, two and a half grams of crack cocaine on a kitchen shelf, and drug paraphernalia, including plastic bags, razor blades, a scale and a vacuum sealer with vacuum sealer bags in the kitchen.

Taken as a whole, the evidence put on by the State at trial was sufficient to establish a connection to the defendant and the subject house on Kentucky Avenue. Moreover, the facts as testified to by Lieutenant Jewell, including the evidence seized at the Kentucky residence that directly links the defendant to the home, strongly support the conclusion that defendant had constructive possession over the contraband and that his wife shared with him knowledge of, and access to, the contraband found in the home.

And although the defense presented the testimony of the defendant's girlfriend, Terry Hunter, who testified that the defendant lives with her 90 percent of the time, she admitted that she is unaware of what he does when he is not with her.

Finally, the defendant's mother testified that the defendant does not live with her but is "back and forth" between Terry Hunter's residence on the Westbank and his wife's home on Kentucky Avenue in Kenner.

As in [*State v.*] *Marshall*, [02-1067 (La.App. 5 Cir. 2/25/03), 841 So.2d 881, *writ denied*, 03-0909 (La.9/26/03), 854 So.2d 345,] while it is possible that the defendant may have stayed at his girlfriend's residence sometime, the evidence established that the Kentucky Avenue home was also where he occasionally stayed based on the direct evidence introduced at trial linking him to the subject residence.

Given the evidence and testimony presented at trial, we find that the evidence is sufficient to support the element of possession. Moreover, we find that the jury could have rationally concluded that the defendant maintained a residence at 3232 Kentucky Avenue with his wife despite the testimony of the defense witnesses, which the jury found to be less credible than that of the State's witnesses.

*Id*. at 897–98.

In *State v. Richards*, 23-448 (La.App. 5 Cir. 11/20/24), 411 So.3d 739, *writ granted in part on other grounds*, 24-1355 (La. 12/11/24), 396 So.3d 945, *writ denied*, 25-28 (La. 4/1/25), 404 So.3d 652, *and writ denied*, 24-1547 (La. 4/1/25), 404 So.3d 656, the police, during a narcotics investigation, observed the defendant leaving a residence which they were surveilling. Approximately a block away from the residence, the police pulled the defendant over, detained him, and transported him to the police department. There, the defendant's vehicle was searched, and pills were found. A search warrant for the defendant's residence was then obtained. While searching the residence, primarily the defendant's bedroom, the police found, among other items, five bags containing pills which tested positive for methamphetamine, heroin, and fentanyl. A stolen firearm was found underneath the defendant's mattress, and the defendant's driver's license, vehicle registration, and a magazine containing live ammunition were found in a drawer. On review, the fifth circuit upheld the defendant's conviction regarding illegal carrying of weapons. Although the defendant was not in the home when a firearm and drugs were found, the fifth circuit determined he had constructive possession of the items "because they were found in an area customarily occupied by [the] defendant." Moreover, a nexus was established "based on the quantity of the fentanyl (over two hundred fifty pills),

18

the firearm magazines and rounds, and the proximity between the firearm and the fentanyl." *Id*. at 755.

The *Richards* court also noted this court's decision in *State v. Williams*, 23-506 (La.App. 3 Cir. 2/7/24), 380 So.3d 192. In *Williams*, the police conducted an investigation in March of 2022. During this investigation, the police searched the defendant's vehicle and found two handguns, a purse containing the defendant's driver license, and a bag containing suspected methamphetamine, fentanyl, and crack cocaine. A few months later, in May of 2022, the police conducted another investigation, during which they searched the defendant's apartment. On a couch in the living room, they found the defendant's purse, and inside there was a mini cylinder container holding fentanyl, methamphetamine, and hydrocodone pills. Elsewhere in the apartment, the police found two digital scales and sixteen hundred dollars.

In affirming the defendant's conviction, this court noted:

> Courts have generally found evidence of constructive possession when a gun is found in an area customarily occupied by the defendant. *State v. Law*, 45,435 (La. App. 2 Cir. 8/11/10), 46 So.3d 764; *State v. Johnson*, 11-238 (La. App. 5 Cir. 12/28/11), 83 So.3d 1075. See *State v. Mose*, 412 So.2d 584 (La. 1982) (gun located in the defendant's bedroom was sufficient for constructive possession); *State v. Mickel*, 09-953 (La. App. 5 Cir. 5/11/10), 41 So.3d 532, *writ denied*, 2010-1357 (La. 1/7/11), 52 So.3d 885 (gun was under the defendant's dominion and control because it was found in a shoe box underneath the bed where he customarily slept); *State v. Roundtree*, 44,817 (La. App. 2 Cir. 3/3/10), 41 So.3d 512 (the defendant was in constructive possession of a gun found protruding from between the mattress and box spring of the bed in which the defendant had been sleeping; the defendant's girlfriend's testimony that she owned the gun and that the defendant had no knowledge of the gun was unconvincing); *State v. Drake*, 45,172 (La. App. 2 Cir. 5/19/10), 37 So.3d 582, *writ denied*, 2010-1468 (La. 1/14/11), 52 So.3d 899 (evidence was sufficient for constructive possession when weapons were found in plain view in the defendant's residence, such that he would

19

have been aware of their presence and would have exercised dominion and control over the weapons); *State v. Lewis*, 535 So.2d 943 (La. App. 2 Cir. 1988), *writ denied*, 538 So.2d 608 (La. 1989), *cert. denied*, 493 U.S. 963, 110 S.Ct. 403, 107 L.Ed.2d 370 (1989) (presence of firearms in the defendant's home, statement by the defendant that one gun belonged to his wife, and discovery of shoulder holster in the master bedroom indicated the defendant's awareness, dominion, and control over the firearms).

*Williams*, 380 So.3d at 200 (quoting *State v. Lattin*, 52-127 (La.App. 2 Cir. 9/26/18), 256 So.3d 484, 488–90). Additionally, this court noted:

After reviewing the State's evidence, the second circuit affirmed the defendant's conviction due to the firearm being found "in an area customarily occupied by the defendant" as well as his proximity to the gun. [*Lattin*, 256 So.3d] at 492. Moreover, considering the facts of the case, the court reasoned Lattin had dominion and control over the firearm because the gun was on a dresser in a shoebox next to the bed where Lattin was sleeping. Therefore, the court concluded, viewing the evidence in a light most favorable to the State, a trier of fact could have found that the State proved beyond a reasonable doubt that Lattin was guilty of the illegal carrying of a weapon with drugs.

*Id*.

Thus, since officers recovered the firearms and cocaine in the defendant's registered vehicle, "an area customarily occupied by [the defendant]," and because the cocaine was found in the defendant's purse, this court found the defendant had constructive possession of these items. *Id*.

Likewise, in *State v. Augustine*, 24-420, p.10 (La.App. 1 Cir. 5/23/25), 417 So.3d 826, 837, *writ denied*, 25-799 (La. 11/12/25), 420 So.3d 706, the first circuit affirmed the defendant's conviction, noting that in the defendant's residence:

paraphernalia was located in open view on the counter. Mail addressed to the defendant and a large amount of cash were located in the master bedroom, along with the charged firearm, which was located in plain view in the defendant's closet, surrounded by his clothes and shoes. The second bedroom, where a large amount of drugs and more drug paraphernalia were located, contained mail addressed to the defendant and items that did not belong to the only other known occupant of the home, Buckhalter. When the defendant arrived home, an unspecified amount of money was located on his person, and he admitted the

20

evidence belonged to him. Further, based on incriminating messages extracted from the defendant's cell phones, the jury could have reasonably inferred the defendant possessed and distributed narcotics.

Finally, in *State ex rel. D.R.*, 10-404 (La. App. 4 Cir. 11/10/10), 51 So.3d 844, *writ denied*, 11-264 (La. 5/27/11), 63 So.3d 996, and *writ denied*, 10-2711 (La. 5/27/11), 63 So.3d 996, a juvenile was adjudicated delinquent for possession of a firearm and narcotics. While the juvenile was at school, detectives searched his bedroom and found marijuana in one dresser and a loaded firearm in another. The fourth circuit found that the nexus was established.

Here, like *Pittman*, Defendant's hypothesis of innocene was that the camper trailer was not his residence because he was living at his workplace. In *Pittman*, however, there was documentation supporting this claim presented at trial. Here, however, there is no such documentation presented by Defendant. As Ms. White testified, Custom Touch Village kept no records on workers, and there were no records introduced at the trial showing Defendant had worked, resided on the job, or had been paid by the business. Consequently, only testimonial evidence was offered to establish Defendant's purported change of residence. To discern whether to accept Defendant's hypothesis, the jury had to weigh the credibility of the witnesses who supported it.

When this testimonial evidence is considered along with the entire body of evidence presented by the State, we find that the jury reasonably rejected Defendant's hypothesis of innocence. Notably, Defendant's mother, Ms. Navarro, testified that only she and Defendant lived on the Kansas Street property. Further, Defendant's driver's license listed Kansas Street as his address. When Defendant allegedly began his small business/shop, he reported to his parole officer that his shop was located at Kansas Street. Additionally, and though he filed paperwork to change his residence with Probation and Parole, Defendant maintained the same

21

address at Kansas Street. Moreover, several items that were found during the search warrant in the camper strongly suggest Defendant currently resided there, and most notable were the valid debit card belonging to Defendant, photos of Defendant, and the wooden box, labeled with Defendant's name, that contained the methamphetamine.

Defendant argues that perhaps others had access to Defendant's residence, and the items found in it belonged to them. As to this argument, the two men who could have ostensibly had access were Mr. Rogers and Mr. Rainwater. However, there was no evidence suggesting either had occupied Defendant's camper. Specifically, Mr. Rogers resided elsewhere, and Ms. Navarro stated that she never saw Mr. Rogers go into Defendant's camper alone. Further, Ms. Navaro testified that she would have found it strange if she ever witnessed Mr. Rogers enter Defendant's camper without Defendant. As for Mr. Rainwater, the only evidence was that he was on Defendant's property once when he drove through its backyard on a four-wheeler. Thus, we find that to conclude these men accessed Defendant's residence required considerable speculation.

Lastly, though Ms. Navarro testified that Defendant was living and working in Sulphur, she also testified that he visited every few weeks to a month to help pay for the utility bill that they shared. Therefore, even if Defendant was temporarily living in Sulphur, it appears that, at minimum, he visited the Kansas Street location regularly, along with the photos of the property in the record showing that Ms. Navarro's trailer was only a few yards away from Defendant's camper.

Considering the above evidence in a light most favorable to the prosecution, any rational trier of fact could have rejected Defendant's hypothesis of innocence and concluded that the camper trailer was Defendant's current residence or an area that Defendant customarily occupied. Consequently, we find that the evidence

presented by the state established Defendant's constructive possession of the methamphetamine, drug paraphernalia, and the firearm that were found in Defendant's residence. It is well established Louisiana law that constructive possession can be found when the items are seized from a location customarily occupied by a defendant. Therefore, concerning Defendant's first and third conviction, we find there was sufficient evidence to support them.

As for Defendant's second conviction concerning illegal carrying of firearms, the remaining factor to be determined is whether there was a nexus between the firearm and methamphetamine. Again, this connection might be established by (1) the type of firearm involved; (2) the type of controlled dangerous substance involved; (3) the quantity of drugs involved; (4) the proximity of the firearm to the drugs; (5) whether the firearm is loaded; and (6) any other relevant evidence. Noting *Richards* especially, we find that nexus was established. While the fact that the methamphetamine and firearm were in separate parts of the residence is different from those cases examined above, the size of Defendant's residence vitiates its significance. As a camper trailer, the residence was quite small, as the photos in the record show that Defendant's camper trailer was about half the size of Defendant's mother's trailer, and Detective Hunt estimated that the residence was only fifty to sixty feet long. Given the size of the residence, Defendant had quick access to each of its parts. Moreover, considering the methamphetamine was found in a box marked with Defendant's last name not far from his bedroom and the firearm that was found in his nightstand, it is reasonable for the jury to find that Defendant knew of these items. "Furthermore, guns and drugs frequently go hand-in-hand." *State v. Allen*, 15-231, p. 14 (La.App. 5 Cir. 10/14/15), 177 So.3d 771, 781.

Finally, as for other evidence suggesting nexus, Mr. Rogers was found on Defendant's property while in possession of methamphetamine which he claimed to

23

have gotten from "here," meaning Defendant's property. Also, Defendant, when he was arrested, had methamphetamine on his person, which demonstrated he was still actively involved with the substance.

Pursuant to the evidence and these circumstances, we find that any rational trier of fact could have found nexus between the firearm and methamphetamine. Thus, we find Defendant's second conviction was also supported by sufficient evidence.

In summary, as to the issue of sufficiency of evidence, and considering the above evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have rejected Defendant's hypothesis of innocence and concluded that the camper trailer was Defendant's current residence or an area that Defendant customarily occupied. Thus, we find that the evidence presented by the state established Defendant's constructive possession of the methamphetamine, drug paraphernalia, and the firearm that were found in Defendant's residence, as it is well established Louisiana law that constructive possession can be found when the items are seized from a location customarily occupied by a defendant. Additionally, and pursuant to the evidence presented by the state, we further find that any rational trier of fact could have found nexus between the firearm and methamphetamine. Therefore, we find there was sufficient evidence to support Defendant's first, second and third conviction; and, thus, find these assignments of error to be without merit.

### ASSIGNMENT OF ERROR NUMBER THREE:

Defendant's last assignment of error raises the issue of ineffective assistance of counsel. His claim is twofold. First, regarding the jury instructions for the charge of illegal carrying of weapons, Defendant claims defense counsel failed to either request that the "nexus" charge be given to the jury or object to the court's failure to instruct the jury about the nexus requirement. Second, Defendant claims defense

24

counsel failed to object to the State's improper reference, which was made in closing arguments, to Defendant's failure to offer an alibi defense at the time of his arrest.

Ineffectiveness of counsel requires a showing of both deficient performance by counsel and prejudice to a defendant's case. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). Generally, a claim of ineffective assistance of counsel is relegated to post-conviction proceedings, unless the record permits definitive resolution on appeal. *State v. Miller*, 99-192 (La. 9/6/00), 776 So.2d 396, *cert. denied*, 531 U.S. 1194, 121 S.Ct. 1196 (2001). The benchmark for judging a claim of ineffectiveness is whether the attorney's conduct so undermined the proper functioning of the adversarial process that the trial cannot be considered to have produced a just result. *Strickland*, 466 U.S. 668, 104 S.Ct. 2052.

*Failure to Ensure the Jury was Instructed About the "Nexus" Requirement*

Defendant notes that defense counsel filed a motion requesting special jury instructions regarding the charge of possession with intent to distribute methamphetamine. However, the motion did not request an instruction on the nexus requirement set forth in *Blanchard*, 776 So.2d at 1165. The Louisiana Supreme Court held in *Blanchard* that when the charge of illegal carrying of weapons is based on constructive possession, the State must prove that there is a nexus between the firearm and controlled dangerous substances. However, the *Blanchard* court further held that "[p]roof of a nexus requirement is not required where the defendant uses or has actual possession of the firearm or has the firearm within his immediate control." *Id*, at 1174. Because the trial court failed to properly instruct the jury as to the nexus requirement, the *Blanchard* court reversed the defendant's conviction for illegal carrying of firearms. Noting this decision, Defendant submits the jury in his case received instructions similar to those given in *Blanchard*, which were the following:

25

In order to convict the defendant of this crime, you must find beyond a reasonable doubt that the defendant: (1) knowingly or intentionally possessed any firearm or other instrumentality customarily used on intended for probable use as a dangerous weapon, while at the same time (2) knowingly or intentionally possessing a controlled dangerous substance, such as marijuana. *Id.*

Here, and in comparison, the following were the instructions given to the jury in Defendant's trial:

## COUNT 2: ILLEGAL CARRYING OF WEAPONS

Insofar as pertinent to this case, Illegal carrying of weapons is committed when the offender uses, possesses, or has under his immediate control any firearm while unlawfully in the possession of a controlled dangerous substance or during the unlawful sale or distribution of a controlled dangerous substance.

Thus, in order to convict the defendant of Illegal carrying of weapons, you must find:

(1) That BILLY W. HYATT was engaged in the commission or attempted commission of unlawful possession of a controlled dangerous substance, on or about January 9, 2023, although the state does not have to prove the exact date; and

(2) That BILLY W. HYATT possessed or had under his immediate control a firearm while committing or attempting to commit such offense.

Defendant notes instructions for count two did not include the "constructive possession" charge that was given with count one. Also, during deliberation, the jury sent a note asking the court to clarify the law regarding Illegal Carrying of Weapons. After discussion with the attorneys, the court re-read the charge:

Count two, illegal carrying of weapons, the defendant is charged in count two of the amended bill of information as follows, in the Parish of Beauregard State of Louisiana, on or about January 9th, 2023, Billy W. Hyatt did willfully and unlawfully violate Revised Statute 1495 illegal carrying of weapons, and that he possessed a firearm while in possession of a schedule two controlled dangerous substance to wit methamphetamine. In so far as pertinent to this case, illegal carrying of weapons is committed when the offender uses possesses or has under his immediate control any firearm while unlawfully in the possession of a controlled, dangerous substance or during the unlawful sale or distribution of a controlled, dangerous substance.

26

Thus, in order to convict the defendant of illegal carrying of weapons you must find one that Billy W. Hyatt was engaged in the commission are attempted commission of unlawful possession of a controlled dangerous substance on or about January 9th, 2023. Although the State does not have to prove the exact date and two that Billy W. Hyatt possessed or had under his immediate control a firearm while committing or attempting to commit such offense.

Defendant submits the jury's question suggests that at least one juror had concerns about this charge. Furthermore, Defendant argues this demonstrates that counsel's failure to object and request the required nexus charge rendered the verdict suspect and resulted in actual prejudice.

*Analysis*

Defendant's conviction is based entirely on constructive possession. Defendant puts forth this issue under a claim of ineffective assistance of counsel. Thus, whether Defendant had been prejudiced by his counsel's error to ensure a nexus instruction is what determines whether to grant relief. Other than the juror's request for the court to clarify the law regarding illegal carrying of weapons, there is no indication that the nexus instruction would have reasonably altered the outcome of the trial, given the strength of the other evidence presented at trial. *State v. Reed*, 14-1980, (La. 9/7/16), 200 So.3d 291, 315, *reh'g granted in part on other grounds*, 14-1980 (La. 10/19/16), 213 So.3d 384, *cert. denied*, 580 U.S. 1166, 137 S.Ct. 787 (2017); *State v. Rickmon*, 23-766, p. 12 (La.App. 4 Cir. 2/18/25), 409 So.3d 284, 292–93. Accordingly, we find Defendant was not prejudiced by his counsel's error and affirm his conviction.

*Failure to Object to State's Improper Closing*

Defendant contends that the prosecutor improperly referenced Defendant's failure to advise police of an alibi at the time of his arrest. Thereby, the State violated his Fifth Amendment right to remain silent and his right to a fair trial. In the State's closing argument, the State, discussing the arrest of Defendant in Sulphur, said:

27

They went down to Sulphur, they worked with Sulphur PD and that's where the defendant ran again. The second time he took off on foot as soon as officers closed in on him and they had to chase him into the bushes just to bring him back and arrest him and even then he had more drugs and even then he had more methamphetamine. Here's what you didn't hear that night, I've been working in this trailer, been putting down floors, I've been staying here and working here with Stevie, you've got this all wrong. You don't hear any of that and nobody came forward. When you watch that body camera including Bridget Cooley to tell officers you've got it all wrong. This is a big misunderstanding and that's because people like Bridget Cooley, who the defendant was with that night were also arrested. They were also on drugs and they possessed their own drugs as well.

Defendant says this was a direct reference to Defendant's exercise of his right to remain silent, and since the evidence of guilt was not overwhelming, it was a strategic choice by the prosecutor to cast doubt on Defendant's alibi defense. Defendant argues that defense counsel should have requested a mistrial to remedy the State's improper argument.

*Analysis*

According to La.Code Crim.P. art. 774, the closing argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the State or defendant may draw therefrom, and to the law applicable to the case. A prosecutor retains "considerable latitude" when making closing arguments. *State v. Castillo*, 13-552, p. 18 (La.App. 5 Cir. 10/29/14), 167 So.3d 624, 642, *writ denied*, 14-587 (La. 11/7/14), 152 So.3d 172, *and writ denied*, 14-2567 (La. 9/18/15), 178 So.3d 145. Further, the trial judge has broad discretion in controlling the scope of closing arguments. *Id*. Nevertheless, even if the State's argument was improper, a conviction or sentence will not be reversed for improper closing argument unless the court is thoroughly convinced the remarks influenced the jury and contributed to the verdict. *Id*.; *State v. Hypolite*, 13-1365, (La.App. 3 Cir. 5/14/14), 139 So.3d 687, *writ denied*, 14-1242 (La. 1/23/15), 159 So.3d 1056. Even where a prosecutor's argument has exceeded the scope of Article 774 or is deemed to be improper, a reviewing court

should credit the good sense and fairmindedness of the jurors who have heard the evidence. *State v. Williams*, 96-1023, (La. 1/21/98), 708 So.2d 703, *cert. denied*, 525 U.S. 838, 119 S.Ct. 99 (1998).

In brief, Defendant cites *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240 (1976), where the United States Supreme Court addressed the issue of whether a prosecutor could seek to impeach a defendant's exculpatory story–told for the first time at trial– via cross-examination as to the failure to tell the story after receiving *Miranda* warnings at the time of arrest. The Supreme Court held that the use for impeachment purposes of a defendant's post-arrest silence violated due process. *See also*, *State v. Arvie,* 505 So.2d 44 (La.1987); *State v. Sam,* 412 So.2d 1082 (La.1982). However, in *State v. George,* 95-110 (La. 10/16/95), 661 So.2d 975, the Louisiana Supreme Court held that not every reference to a defendant's post-arrest silence requires reversal. The *George* court also found that "*Doyle* condemns only 'the use **for impeachment purposes** of [the defendant's] silence at the time of arrest, and after receiving *Miranda* warnings. . . .*" Id.* at 980 (emphasis added), (alterations in original).

Here, the State contested Defendant's alibi in Defendant's case in chief by cross-examining his witnesses and by presenting their rebuttal witnesses, but the state never used Defendant's post-arrest silence as means for impeachment while doing so. Indeed, even the Defendant does not now claim the State referenced his silence for impeachment purposes. Rather, Defendant argues that the State made the reference in order to cast doubt on his alibi defense since the evidence of guilt was not overwhelming and the trial was not otherwise fair. Also, Defendant cites *State v. Duong*, 13-763 (La.App. 5 Cir. 8/8/14), 148 So.3d 623, *writ denied*, 14-1883 (La. 4/17/15), 168 So.3d 395. However, in *Duong*, the State questioned a witness about the defendant's post-arrest silence and referenced the silence again during closing

arguments, but the fifth circuit found the State's violation of *Doyle* to be harmless because the defendant's post-arrest silence was not stressed or emphasized throughout the entirety of the trial, and the trial as a whole was fairly conducted and there was patently overwhelming proof of guilt.

In this case, the first time the State mentioned Defendant's silence was in closing arguments. Further, we find that the Defendant produced no evidence that the State's remark influenced the jury and contributed to the verdict. Thus, we find no prejudice to Defendant's case. Therefore, Defendant's claim of ineffective assistance of counsel is without merit.

## **DECREE**:

Defendant's convictions and sentences are affirmed.

**AFFIRMED.**